UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————

No. 05 Civ. 751 (RJS)

———————————

ADEYINKA ADEBIYI,

Plaintiff,

VERSUS

YANKEE FIBER CONTROL, INC. and AQUA-DYNE, INC.,

Defendants.

———————————

MEMORANDUM AND ORDER
April 5, 2010

———————————

RICHARD J. SULLIVAN, District Judge:

The Court presided over a jury trial in this products-liability case from October 6, 2009 to October 16, 2009. Following trial, the jury returned a verdict awarding Plaintiff Adeyinka Adebiyi nearly $4 million in damages. Now before the Court are Defendant Aqua-Dyne, Inc.'s motions (1) for judgment as a matter of law, (2) for a new trial, and (3) to set aside the damages award.[1] For the reasons stated below, the motions are granted in part and denied in part. The Court assumes the parties' familiarity with the underlying facts.

I. MOTION FOR JUDGMENT AS A MATTER OF LAW

A. Standard of Review

"If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may . . .

---

[1] On October 2, 2009, Defendant Yankee Fiber Control, Inc. agreed to settle Plaintiff's claims for $800,000. (Sept. 2, 2009 Tr. at 19:13 - 22:23.) Accordingly, the Court uses the term "Defendant" to refer to Aqua-Dyne, Inc. throughout this Memorandum and Order.

resolve the issue against the party." Fed R. Civ. P. 50. In determining whether there was a legally sufficient evidentiary basis for the jury's conclusion, the Court must "defer[] to the jury's assessment of the evidence and all reasonable inferences the jurors could draw from that evidence," and "may not itself weigh the credibility of witnesses or consider the weight of the evidence." *Meloff v. N.Y. Life Ins. Co.*, 240 F.3d 138, 145 (2d Cir. 2001) (internal quotation marks omitted). "A movant's burden in securing Rule 50 relief is particularly heavy after the jury has deliberated in the case and actually returned its verdict." *Cross v. N.Y. City Transit Auth.*, 417 F.3d 241, 248 (2d Cir. 2005). "Under such circumstances, the district court may set aside the verdict only where there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him." *Id.* (citations, alterations, and internal quotation marks omitted).

### B. Discussion

Defendant was found liable for failure to warn under New York common law. To prevail on this claim, Plaintiff was required to demonstrate that (1) Defendant had a duty to warn, (2) Defendant breached that duty, (3) the defect was the proximate cause of Plaintiff's injury, and (4) Plaintiff suffered damages as a result of the breach. *See Adeyinka v. Yankee Fiber Control, Inc.*, 564 F. Supp. 2d 265, 280 (S.D.N.Y. 2008).[2]

---

[2] As counsel are now aware, Plaintiff's name is Adeyinka Adebiyi, and not Adebiyi Adeyinka, the name under which this lawsuit was filed. The caption of the case has since been revised. (*See* Doc. No. 106.)

Defendant's motion for judgment as a matter of law challenges two of these elements, arguing (1) that Defendant did not breach its duty to warn, and (2) that even assuming that it had, Yankee Fiber's negligence was an intervening cause that broke the chain of causation from Defendant. The Court rejects both arguments.

1. Breach of the Duty To Warn

Defendant argues that it did not breach its duty to warn because (1) it provided extensive training to Yankee Fiber, and (2) Plaintiff failed to prove that superior warnings could have been placed directly on the mini-scrubber. Both of these arguments may be rejected.

a. Defendant's Warnings to Yankee Fiber

Defendant first contends that it did not breach its duty to warn because it provided extensive warnings to Yankee Fiber, the company that purchased the mini-scrubbers from Defendant. It is well established in New York, however, that the duty to warn "extends to warning *ultimate consumers* of the dangers resulting from the foreseeable use of the product." *Urena v. Biro Mfg. Co.*, 114 F.3d 359, 366 (2d Cir. 1997) (emphasis added). Thus, to the extent Defendant is suggesting that its duty to warn extended only to Yankee Fiber, it is mistaken. Whether Yankee Fiber's negligence in failing to pass on these warnings to the New York City Housing Authority was an intervening cause relieving Defendant of liability is a separate question that the Court addresses in Section I.B.2, *infra*.

b. The Possibility of Superior Warnings

Defendant also contends that Plaintiff failed to prove that the warnings provided on the mini-scrubber were inadequate,

insofar as (1) Plaintiff provided no expert testimony regarding the warnings, and (2) there was some testimony at trial that placing warnings directly on the mini-scrubber would have been infeasible.

In New York, "the jury does not need expert testimony to find a warning inadequate, but may use its own judgment considering all the circumstances." *Billiar v. Minn. Mining & Mfg. Co.*, 623 F.2d 240, 247 (2d Cir. 1980). Thus, Plaintiff was not required to proffer expert testimony suggesting that the warnings placed on the mini-scrubber were inadequate (or that superior warnings could have been designed), and the jury was free to reject Dr. Conn's deposition testimony suggesting that a warning label would have been ineffective. (Liability Tr. at 296:23 - 297:25).[3] The jury was also free to consider Plaintiff's own testimony that he would have heeded a warning, had one been present. (*Id.* at 320:25 - 321:20.) While Defendant argues that this testimony is "self-serving," the appropriate weighing of self-serving statements "is a matter for the finder of fact at trial." *In re Dana Corp.*, 574 F.3d 129, 153 (2d Cir. 2009). Accordingly, the jury's conclusion that Defendant breached its duty to warn is supported by sufficient evidence to withstand the instant motion.

2. Intervening Causation

Defendant also argues that the Court should have ruled, as a matter of law, that Yankee Fiber's negligence was an intervening cause that insulates Defendant from liability. In support of this contention, Defendant relies principally upon *McLaughlin v. Mine Safety Appliances Co.*, 11 N.Y.2d 62 (1962). In *McLaughlin*, a young girl was rescued from drowning by a nurse and a firefighter. *Id.* at 65. The girl was suffering from hypothermia, and so the firefighter retrieved heat blocks from his truck to treat her. *Id.* The firefighter had been trained by the distributor of the heat blocks, and he knew that they were not supposed to be placed directly against the girl's skin. *Id.* at 67. Nevertheless, he activated the blocks and watched passively as the nurse applied them directly to the girl's skin. *Id.* The girl suffered third-degree burns. *Id.* at 65.

The trial court instructed the jury that the distributor of the heat blocks could still be liable, notwithstanding the firefighter's negligence in allowing the nurse to apply the blocks, if it could be shown that the distributor "should have expected use of the block by some person other than those to whom instruction as to its use had been given." *Id.* at 70. The jury then returned a verdict in favor of the plaintiff. The Court of Appeals reversed, writing that "the court should have charged that if the fireman did so conduct himself, without warning the nurse, his negligence was so gross as to supersede the negligence of the defendant and to insulate it from liability. This is the rule that prevails when actual knowledge of the latent danger or defect is *actually* possessed by the original vendee, who then deliberately passes on the product to a third person without warning." *Id.* at 71.

Defendant relies on *McLaughlin* for the broad proposition that an intermediary's failure to pass on a warning relieves the manufacturer of liability as a matter of law. This reading, however, has been soundly rejected by the United States Court of Appeals for the Second Circuit, which is

---

[3] The trial of this action was bifurcated into a liability phase and a damages phase, the transcripts of which are separately paginated. Accordingly, the Court cites to the transcript of the liability phase as "Liability Tr." and the transcript of the damages phase as "Damages Tr."

3

binding authority on this Court.[4] Writing twenty-five years after the *McLaughlin* decision, the Second Circuit wrote:

> [N]otwithstanding the intervention of an act of a third person between the original negligence and the ultimate injury, the original negligent actor can be found to have proximately caused the injury if the intervening act was normal or foreseeable. When, as is usually the case, circumstances permit varying inferences as to the foreseeability of the intervening act, the proximate cause issue is a question of fact for the jury.
>
> . . .
>
> While the discussion in *McLaughlin* might be read to suggest that an intervening actor's gross negligence is a superseding cause that relieves the original negligent actor from liability, the more recent New York cases discussed above, holding that reckless, intentional, and even criminal intervening acts are not superseding causes when they are foreseeable, indicate that such a reading would not accurately reflect current New York law.

*Woodling v. Garrett Corp.*, 813 F.2d 543, 555-56 (2d Cir. 1987) (citations omitted).

In the instant case, the Court instructed the jury as follows:

> [I]f you find that Defendant provided inadequate warnings, but that Plaintiff's injuries were also caused by the actions of others — such as Plaintiff himself, Yankee Fiber Control, or the New York City Housing Authority — and you find that the Defendant in the exercise of reasonable prudence would have foreseen the actions of those parties, then Defendant is still a proximate cause of Plaintiff's injuries.
>
> If, on the other hand, you find that Plaintiff's injuries were caused by the actions of Plaintiff, Yankee Fiber Control, or the New York City Housing Authority, and that their actions were not foreseeable by Defendant, then Defendant's failure to provide adequate warnings was not a proximate cause of Plaintiff's injuries, and your verdict shall be for Defendant.

(Liability Tr. at 457:12 - 458:1). These instructions are consistent with the Second Circuit's *Woodling* decision and accurately reflect New York law.

Because Defendant is incorrect (1) that it did not owe a duty to Plaintiff, and (2) that it was not, as a matter of law, the proximate cause of Plaintiff's injury, its motion for judgment as a matter of law is denied.

## II. MOTION FOR A NEW TRIAL

### A. Standard of Review

Federal Rule of Civil Procedure 59 provides that a Court may order a new trial

---

[4] While a more recent decision regarding New York law from the New York Court of Appeals would trump an earlier decision from the Second Circuit, *see In re E. & S. Dists. Asbestos Litig.*, 772 F. Supp. 1380, 1391 (S.D.N.Y. 1991), *rev'd on other grounds*, *In re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831 (2d Cir. 1992), where the Second Circuit is merely interpreting existing New York cases, "[t]he Court is bound by Second Circuit precedent, even on issues of state law." *Granite Enters. Ltd. v. Virgoz Oils & Fats Pte.*, No. 09 Civ. 4534 (RWS), 2010 WL 532310, at *1 (S.D.N.Y. Feb. 11, 2010); *accord, e.g.*, *Euro Trust Trading S.A. v. Uralsib Ins. Group*, No. 09 Civ. 4712 (RJH), 2009 WL 5103217, at *1 (S.D.N.Y. Dec. 23, 2009).

"for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Granting a new trial is appropriate where "the jury has reached a seriously erroneous result or its verdict is a miscarriage of justice." *Nimely v. City of N.Y.*, 414 F.3d 381, 392 (2d Cir. 2005) (internal quotation marks and citations omitted). "Unlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict. Moreover, a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998).

### B.  Discussion

#### 1.  Verdict as Against the Weight of the Evidence

Defendant has failed to meet its burden of demonstrating that the jury's verdict was "seriously erroneous" or a "miscarriage of justice," *Nimely*, 414 F.3d at 392, such that a new trial would be appropriate. In support of its motion, Defendant principally incorporates its prior arguments regarding (1) the absence of a legal duty to Plaintiff, and (2) the absence, as a matter of law, of proximate cause. With these legal challenges rejected, Defendant fails to argue that, within the legal framework that was presented to the jury, the verdict finding Defendant liable was overwhelmingly against the weight of the evidence.

#### 2.  "Preclusion" of Medical Experts[5]

While Defendant does little to argue that the jury's verdict was a miscarriage of justice, it does argue that the "Court erred in precluding defense medical experts from testifying," such that a new trial might also be appropriate on those grounds. Defendant is mistaken, for the Court did not "preclude" either Dr. Lester Lieberman or Dr. Andrew Bender from testifying. Rather, the Court declined to rearrange its calendar and delay the jury's deliberations so that Defendant's own expert witnesses could testify at a time most convenient to them. Neither decision falls outside the "broad authority" afforded

---

[5]  The Court would not typically comment on typographical errors in a memorandum of law, for most writers, including those in robes, are unable to entirely purge such mistakes from their written work. It must be noted, however, that the post-trial memorandum submitted over defense counsel's signature is uncommonly sloppy. In a memorandum that is riddled with errors, the section suggesting that the Court improperly excluded Defendant's experts stands out. On one doubled-spaced page (Def.'s Mem. at 22), the memorandum states that (1) "defense expert *was* a scheduled vacation," (2) "Defendant *further* an alternate schedule which *wuold* have allowed Dr. Bender to testify," (3) "The court denied *defendants* request," (4) "The *curt* was advised that Dr. Lieberman was required to attend to patients on Riker's Island and *if left any earlier* [he would lose his position]," (5) "Defendant requested a slight accommodation of one hour and *suggestedmoving* the lunch hour," and (6) "The court . . . made it clear that if Dr. Lieberman was not ready to testify when the *nest* witness testimony was completed," he would not be permitted to testify. These are merely the typographical errors; the list does not include the incomplete sentence ("While the trial schedule is within the discretion of the trial judge.") or the run-on sentence ("[Defendant] advised the court that Dr. Lester Lieberman would be able to testify on Thursday, October 15, 2009, however, he would be able to arrive before 1 p.m."). The list also does not include the sentence missing a word that is critical to its meaning, for in the run-on sentence identified above, counsel undoubtedly means that Dr. Lieberman would *not* have been able to arrive before 1 p.m.

5

to district judges to manage their own trial schedules and run their own courtrooms. *See Harris v. Barkley*, 202 F.3d 169, 170 (2d Cir. 2000).

### a. Dr. Lieberman

At the very end of the day on October 14, Defendant requested that the Court revise its anticipated schedule for October 15 to adjourn for lunch at noon, instead of 1:00 p.m., as Dr. Lieberman could not be available until 1:00 p.m. (Damages Tr. at 344:10-16.) The Court declined to modify its calendar but told defense counsel to convey to Dr. Lieberman its instruction that he be in court at 11:30 a.m. (*Id.* at 345:5-7.)

The following morning, defense counsel informed the Court that Dr. Lieberman would not comply with the Court's order, as he was required to be at work at 11:30 a.m. (*Id.* at 349:21-25.) The Court instructed defense counsel that if he did not have a witness present when the prior witness was finished testifying, he would be deemed to have rested. (*Id.* at 350:3-6.) Prior to the lunch break, when prompted for his next witness, Defense counsel affirmatively indicated that he was resting his case. (*Id.* at 423:11.) Following lunch, the Court informed defense counsel that if Dr. Lieberman were available by 1:30, it would allow him to reopen his case. (*Id.* at 425:3-4.) Dr. Lieberman was apparently still unavailable, however, and the trial proceeded to closing argument. (*Id.* at 428:2.)

### b. Dr. Bender

The Court's practice, during this and most other trials held before it, is to sit on Monday through Thursday, with Friday reserved for the Court to hear other matters. On the morning of Tuesday, October 13, defense counsel informed the Court that Dr. Bender did not intend to return from his vacation in Italy until the morning of Friday, October 16. (*Id.* at 2:23-24.) Defense counsel thus asked the Court to not hold trial on Wednesday, October 14, and instead hold trial on Friday, October 16. The Court declined to do so, as it had seven other matters scheduled on Friday. (*Id.* at 4:7-17.) On the afternoon of October 13, Defendant informed the Court that it was not going to call Dr. Bender. (*Id.* at 135:2.)

The Court was not bound to inconvenience itself, jurors, court staff, and other litigants so that Defendant's own retained experts could testify at a time most convenient to them. That is particularly true here, where the trial date was scheduled more three months in advance and where defense counsel waited until the jury was sworn to raise its scheduling issues with the Court. The unavailability of the witnesses in question was clearly a result of defense counsel's own lack of due diligence in preparing for trial, a failure for which the law does not provide post-verdict relief. *See, e.g.*, *Lewis v. Rawson*, 564 F.3d 569 (2d Cir. 2009) (upholding a district court's denial of a continuance after the jury had already been sworn); *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 100 (2d Cir. 2001) (upholding a district court's denial of a continuance to accommodate a witness when the trial date had been set far in advance); *Winston v. Prudential Lines, Inc.*, 415 F.2d 619, 620 (2d Cir. 1969) (noting a trial judge's "broad discretion in granting or denying a request for short continuances during the course of a trial"). Defendant's motion for a new trial is accordingly denied.

### III. MOTION TO REDUCE THE VERDICT

Following the damages phase of trial, the jury returned a verdict awarding Plaintiff damages for (1) past lost wages in the amount of $261,362; (2) future lost wages in

the amount of $791,531; (3) past medical expenses in the amount of $110,800; (4) future medical expenses in the amount of $267,572; (5) past pain and suffering in the amount of $1 million; and (6) future pain and suffering in the amount of $1.5 million.

Defendant argues that the jury's awards for pain and suffering, future medical expenses, and future lost wages must be set aside. The Court agrees only with respect to the jury's award for pain and suffering.

### A. Standard of Review

Section 5501(c) of New York's Civil Practice Law and Rules provides for the reduction of a jury award that "deviates materially from what would be reasonable compensation." N.Y. C.P.L.R. § 5501(c). "[T]he determination of whether an award 'deviates materially from what would be reasonable compensation' requires a court to compare verdicts sustained by New York courts in similar cases." *Okraynets v. Metro. Transp. Auth.*, 555 F. Supp. 2d 420, 435 (S.D.N.Y. 2008). The Supreme Court has held that a federal district court sitting in diversity is bound to apply this substantive standard. *See Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415 (1996).

Section 5501(c) "has been understood by both courts and commentators as providing courts with greater latitude than the former 'shocks the conscience' standard for reviewing and altering jury awards." *In re Joint E. & S. Dist. Asbestos Litig.*, 9 F. Supp. 2d 307, 310 (S.D.N.Y. 1998). Nevertheless, in exercising its remittitur power, the Court must use the "least intrusive standard for calculating a remittitur" — in other words, it may reduce the award no lower than "the maximum that would be upheld by the trial court as not excessive." *Earl v. Brouchard Transp. Co., Inc.*, 917 F.2d 1320, 1328, 1330 (2d Cir. 1998). As the Second Circuit has explained, "the plaintiff is unlikely under this standard to opt for a second trial. Once the remittitur is calculated, the plaintiff becomes fully informed of the maximum award that the district court would permit any jury to return in that particular case." *Id.* at 1328.

### B. Pain and Suffering

The jury heard testimony that Plaintiff suffered the following injuries: laceration of his right forearm, including to his tendons and nerves (Damages Tr. at 34:5-16); keloid scarring on his right forearm (*id.* at 43:22 - 44:1); atrophy to the muscles of his right forearm, wrist, and hand (*id.* at 65:12-22); inability to straighten the fingers on his right hand or use them to grasp (*id.* at 216:3 - 217:4); injuries to his neck, back, and right shoulder (*id.* at 59:20-24); headaches (*id.* at 50:1); causalgia on his right arm (*id.* at 44:3 - 44:9); depression (*id.* at 46:24); memory loss (*id.* at 61:4); and insomnia (*id.* at 44:25 - 45:1).

The jury also heard testimony about the extensive medical treatment that Plaintiff required. Specifically, it heard testimony that Plaintiff required emergency surgery on his forearm (*id.* at 33:7-12) and subsequent surgery on his shoulder (*id.* at 72:33-74:5). It also heard that Plaintiff requires substantial medication, including various pills and trigger-point injections (*id.* at 45:6-22), to manage his pain.

Plaintiff testified that he "feel[s] terrible pain all over [his] body and [his] hand like fire." (*Id.* at 176:10-11.) Plaintiff also compared the pain to an "electric shock running up and down from [his] finger to [his] shoulder." (*Id.* at 185:22-24.) He testified that he often will "wake up in the middle of the night and . . . will not be able to sleep again because of [his] pain." (*Id.* at 201:10-13.) He also described difficulty

concentrating and reading as a result of the pain. (*Id.* at 203:7-9, 212:11-16.) Dr. Shan Nagendra, Plaintiff's neurologist, testified that Plaintiff was likely to experience this pain for the rest of his life. (*Id.* at 76:18 - 77:5.)

Having compared the jury's award for pain and suffering in this case to awards in many similar cases, including every case cited by the parties, the Court is persuaded that the jury's award deviates materially from reasonable compensation.

Two cases in which jury verdicts were reduced following trial are particularly instructive. In *Fudali v. New York City Transit Authority*, No. 118063/02, 2005 WL 320990 (N.Y. Sup. Ct. N.Y. Co. Jan. 7, 2005), a fifty-seven-year-old woman was hit by a New York City bus. She required twelve days of hospitalization and two operations. Her injuries included "a fracture of the proximal humerus with the bone protruding through her skin, cracks in the greater tuberosity and humeral head, and a rupture of the biceps tendon." *Id.* at *1. Her orthopedist testified "that plaintiff suffers a permanent disability which leaves her with a limited range of motion of her left arm, and lifelong pain." *Id.* The plaintiff testified "that she cannot dress herself, change sheets, wash windows, or hold anything in her left hand." *Id.* After the jury awarded $1.25 million for past pain and suffering and $1.5 million for future pain and suffering, the Court reduced the award to $650,000 for past pain and suffering and $550,000 for future pain and suffering. *Id.* at *2. In *Araujo v. Marion Mixers*, 735 N.Y.S.2d 402 (2d Dep't 2001), a forty-year-old man "lost his left arm just below the shoulder." *Id.* at 403. The jury's award of $1.14 million in past pain and suffering and $3.87 million in future pain and suffering was reduced to $650,000 for past pain and suffering and $550,000 for future pain and suffering. *Id.*

The Court has also considered numerous cases in which jury verdicts were not overturned or reduced. In *Heffernan v. Cedar Tavern, Inc.*, No. 102924/02, 2004 WL 332943 (N.Y. Sup. Ct. N.Y. Co. Jan. 22, 2004), the jury awarded a total verdict of $752,000 to a plaintiff who "sustained lacerations to several tendons in his right, dominant, forearm and a complete laceration of his right arm's median nerve" and required "neurosurgery and nine months of physical and occupational therapy." *Id.* In *DiGennaro v. Wal-Mart Stores*, No. 97-7794, 1998 WL 51344 (2d Cir. Feb. 10, 1998), the Second Circuit upheld a jury award of $600,000 to a forty-two-year-old plaintiff after a sheet of ice fell off of a Wal-Mart store and landed on her head. She "had persistent elbow pain with shock-like sensations radiating into her arm and hand and she was unable to lift even moderately heavy objects." *Id.* at *1. She required ulnar nerve transposition surgery, which was not successful. *Id.* She suffered from atrophy of the muscles in her arm and hands; in addition to suffering from reduced grip strength, she experienced pain and numbness in her left arm and hand. *Id.* In *Keefe v. E & D Specialty Stands, Inc.*, 708 N.Y.S.2d 214 (4th Dep't 2000), the Appellate Division upheld a jury verdict of $1 million to a plaintiff who "suffered a laceration to his ulnar nerve while performing iron work on bleachers and, despite three surgeries, has a permanent loss of feeling in his right [dominant] hand . . . and a permanent 50% loss of strength in that hand." *Id.* at 214-15. In *Cabezas v. City of New York*, 756 N.Y.S.2d 566 (1st Dep't 2003) the Appellate Division upheld an award of $450,000 for past pain and suffering and $450,000 for future pain and suffering to a plaintiff who "suffered a comminuted intra-articular distal radius fracture and displaced ulna styloid fracture" after falling on a sidewalk, requiring two

8

surgeries and resulting in limited wrist motion and limited grip strength. *Id.* at 567. In *Baez v. New York City Transit Authority*, 790 N.Y.S.2d 110 (1st Dep't 2005), the Appellate Division upheld an award of $600,000 for past pain and suffering and $380,000 for future pain and suffering to a fifty-six-year-old plaintiff who "sustained a painful, comminuted, mid-shaft humeral fracture of her right arm," required multiple surgeries and physical therapy, and still was left "with limited forearm rotation, numbness in her little finger[,] . . . weakness in her hand" and "three large, raised keloid scars." *Id.* at 110.[6]

---

[6] The cases relied upon by Plaintiff generally include either amputations or serious spinal injuries. *See Martell v. Boardwalk Enters., Inc.*, 748 F.2d 740 (2d Cir. 1984) (reducing a pain-and-suffering award to $1.2 million for a plaintiff who suffered the loss of two-thirds of an arm, multiple fractured ribs, and a punctured lung); *Huff v. Rodriguez*, 846 N.Y.S.2d 841 (4th Dep't 2007) (reducing an award to $500,000 for past pain and suffering and $3 million for future pain and suffering to a plaintiff who suffered "six, or possibly seven, herniated discs and at least three annular tears in her cervical spine" and thus required lumbar fusion surgery and the use of a bone-growth stimulator); *Hotaling v. CSX Transp.*, 773 N.Y.S.2d 755 (3d Dep't 2004) (reducing an award to $4 million for past pain and suffering and $2 million for future pain and suffering for a plaintiff whose "left leg was virtually blown open from about the middle of his thigh down to his calf" and, during the hour and a half that it took for him to be rescued, "pieces of metal were scattered into his open wounds); *Young v. Tops Markets, Inc.*, 725 N.Y.S.2d 489 (4th Dep't 2004) (reducing an award to $1 million for past pain and suffering and $2.5 million for future pain and suffering to a plaintiff who "sustained serious injuries to his right femur, spinal column, pelvis, and right knee and heel that cause continuous pain"); *Hoenig v. Shyed*, 727 N.Y.S.2d 80 (1st Dep't 2001) (upholding an award of $2 million for past pain and suffering and $3.6 million for future pain and suffering to a plaintiff whose right leg was amputated above the knee); *Sladik v. Hudson Gen. Corp.*, 641 N.Y.S.2d 270 (1st Dep't 1996) (upholding an award of $2.5 million for past pain and suffering and $5 million for future pain and suffering to a plaintiff requiring amputation eight inches above the knee and suffering deteriorating of the other leg); *Flynn v. Farias*, 528 N.Y.S.2d 486 (Sup. Ct. 1988) (reducing a pain-and-suffering award to $2 million for a plaintiff suffering numerous injuries, including amputation of her right arm above the elbow).

---

Having considered the cases discussed above, the Court is persuaded that the jury's award for pain and suffering deviates materially from reasonable compensation. The Court further finds that an award of $600,000 for past pain and suffering and $900,000 for future pain and suffering is the highest award that could survive a motion under Section 5501(c). If Plaintiff does not stipulate to such an award by May 5, 2010, the Court shall schedule a new trial on damages.

### C. Future Medical Expenses

The jury awarded damages for future medical expenses in the amount of $267,572. Under New York law, "[t]o ensure that they do not 'materially deviate from reasonable compensation,' the plaintiff must prove [his] future medical expenses 'with reasonable certainty.'" *Marcoux v. Farm Serv. & Supplies, Inc.*, 290 F. Supp. 2d 457, 479 (S.D.N.Y. 2003) (quoting N.Y. C.P.L.R. § 5501(c) and *Patterson v. Kummer Dev. Corp.*, 755 N.Y.S.2d 180 (4th Dep't 2003)).

In this case, Dr. Nagendra testified in detail about the medical treatment that he expected Plaintiff to require in the future. Specifically, he testified that Plaintiff would require

(1) monthly office visits with him at a cost of $200 each, for the rest of his life (Liability Tr. at 82:21 - 83:9);

(2) between five and seven trigger-point injections per month, at a cost of $35 each, for the rest of his life (*id.* at 83:15-24);

9

(3) between $350 and $400 per month of medication, for the rest of his life (*id.* at 84:3-7);

(4) $1000 annually of diagnostic examinations, for the rest of his life (*id.* at 84:8-17);

(5) twenty-four sessions per year of physical therapy, at a cost of $100 each, for the rest of his life (*id.* at 84:18 - 85:4);

(6) between weekly and monthly sessions with a psychiatrist, for the next one to two years, at a cost of $125 per visit (*id.* at 85:5 - 85:14); and

(7) annual visits to an orthopedist, at a cost of $300 per year, for the rest of his life (*id.* at 85:19 - 86:3).

The jury also heard testimony that Plaintiff's life expectancy was nineteen and a half years. (*Id.* at 147:11-15.)

Assuming the highest end of each range (i.e., seven trigger-point injections per month, $400 per month of medication, and weekly visits to a psychiatrist for the next two years), the future medical expenses would total $282,280. The jury's award of $267,572 fell below this number, and accordingly, it is supported by sufficient evidence to withstand Defendant's motion. Defendant's argument that Dr. Nagendra was not competent to testify as to the cost of services provided by others may be easily rejected, for Defendant did not object at trial to this testimony. *See United States v. Bilzerian*, 926 F.2d 1285, 1294-95 (2d Cir. 1991) ("[S]ince the expert's general testimony was not objected to at trial, the issue was waived.").

### D. Lost Earnings

Finally, Defendant argues that the jury's award for future lost earnings must be set aside, as (1) the jury heard testimony suggesting that Plaintiff was able to work, and (2) Plaintiff lost the right to work legally in the United States following his accident.

Both arguments may be rejected. While Defendant offered the testimony of Dr. Jackie Wilson suggesting that Plaintiff would be able to find employment as a loan officer despite his injuries (Damages Tr. at 297:1-25), the jury was free to reject this testimony and credit Plaintiff's own testimony that his constant pain made him unable to concentrate, read, or otherwise work productively. The jury was also entitled to credit Plaintiff's statement that he had not sought to renew his work permit because of his injuries (*id.* at 259:19-21), but that, had he not been injured, he would have done so.

### IV. CONCLUSION

For the reasons stated above, Defendant's post-trial motions are DENIED, except as to the jury's award of damages for pain and suffering. If Plaintiff does not stipulate to a reduced damages award of $600,000 for past pain and suffering and $900,000 for future pain and suffering by May 5, 2010, the Court shall schedule a new trial on damages.

SO ORDERED.

_____
RICHARD J. SULLIVAN
United States District Judge

Dated: April 5, 2010
New York, New York

10

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/5/10